UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PABLO P. PINA,<br><br>    Plaintiff,<br><br>  v.<br><br>JAMES TILTON, Director/Secretary; et al.,<br><br>    Defendants.<br>_____ / | No. C 07-4989 SI (pr)<br><br>**ORDER OF SERVICE AND PARTIAL DISMISSAL** |

## INTRODUCTION

Pablo P. Pina, an inmate at Pelican Bay State Prison, filed this civil rights action under 42 U.S.C. § 1983. Although there originally were three plaintiffs, the court dismissed Pina's two co-plaintiffs from the action and ordered Pina to file an amended complaint. His first amended complaint is now before the court for review under 28 U.S.C. § 1915A. His motion for appointment of counsel and request for production of documents also are before the court.

## BACKGROUND

The first amended complaint is separated into five causes of action and alleges the following:

<u>Gang Inactivity Review</u>: The first cause of action concerns prison officials' refusal to release Pina from the security housing unit ("SHU") as an inactive gang affiliate. First Amended Complaint ("FAC"), ¶¶ 1-84. Pina currently is in administrative segregation ("ad-seg") in the SHU at Pelican Bay based on his validation as an active member of the Nuestra Familia prison

gang. He has been in the SHU at various prisons apparently continuously since his most recent arrival in the CDCR in 1986. His first several years in the SHU were spent serving time on a SHU term left over from an earlier incarceration. In 1993, he was informed that he had completed the determinate SHU term but would be retained in the SHU on an indeterminate basis due to his gang affiliation. He does not complain about his initial placement, or any particular periodic review of that placement, but instead about an inactive status review. He concedes that he was active in a gang in the past, see, e.g., FAC, ¶¶ 38, 58, 62, but denies that he continues to be associated with it.

In September 2004, Pina had an inactive status review to determine whether he was inactive in the gang and could be released from ad-seg. He was denied inactive status. In connection with that review, he received two CDC-1030 confidential information disclosure forms that indicated confidential information from 2001 showed his continued affiliation with the Nuestra Familia gang. Pina told the hearing officers at the review that he was no longer associated with his former gang. When the hearing officers mentioned that he was on a lot of gang hit lists, Pina told the officers he knew that his gang history and gang assaults meant that he would have enemies but asserted that the existence of enemies should not matter in determining whether he could be released from the SHU. He was denied inactive status. In addition to complaining about the decision denying him inactive status, he complains about the adequacy of the review of that decision and the quality of the information on which the decision-makers relied.

Pina and other gang affiliates were moved from their SHU cells to other SHU cells that were on a short corridor. This allegedly isolated the inmates in the short-corridor housing units from other SHU inmates. Pina was not asked if he wanted to be put there before being moved there.

Legal Mail: The second cause of action concerns prison staff opening mail that Pina claims was legal mail. FAC ¶¶ 85-109. Defendant Parker opened mail from attorney Tony Serra. Defendants Depew and Carrier opened mail from the ACLU and from attorney Gloria Allred. Other mail from public officials has been opened outside his presence. He has filed

2

inmate appeals about the opening of his mail and various defendants have denied those appeals.

C/O McCovey: The third cause of action is rather unusual and concerns a personnel problem at the prison that tangentially involved Pina. FAC, ¶¶ 110-196. After Pina arrived in the short corridor cell in January 2006, he was able to hear what was being said in the control booth for his housing unit. He heard correctional officer ("C/O") Parker complain to other staff members about C/O McCovey and eventually attempt to get McCovey banned from the housing unit. Apparently during the discussions between Parker and other correctional staff about McCovey, Pina's name was mentioned in the discussions although Pina does not know or explain what the correctional staff was saying about him. Eventually, McCovey was restricted from entering the housing unit. Pina thought that being connected to the problem with McCovey would adversely affect the inactive gang review that would be done for him. He complained about his concerns and asked for copies of any report about him and/or McCovey that mentioned his name, but his request was not granted. Pina's allegations make it clear that he does not know that any report was ever written that mentioned him in an adverse way, or that any information about the McCovey problem has been used to his detriment – he merely speculates that there might be something in writing and he wants to see it. He claims he has a right under the regulations to have his records corrected, and that he has been denied his due process rights. He also appears to complain that McCovey was treated differently than others, and that McCovey may lose her job.

Inmate Appeals And Outgoing Mail: In the fourth cause of action, Pina complains that prison officials refuse to properly process his inmate appeals. FAC, ¶¶ 197-209. He also alleges that associate warden Scavedra implemented a procedure that all outgoing mail from the SHU would be marked with a large red stamp that reflected that the mail originated in the SHU.

SHU Conditions: In the fifth cause of action, Pina complains about the general conditions in the SHU. FAC, ¶¶ 210-223. He alleges that he and other SHU inmates are subjected to many harsh conditions that do not exist in the general population. SHU inmates allegedly are not allowed the same property and canteen privileges as in the general population, are not allowed contact visits (but instead must visit in a plexiglass booth and talk to visitors by telephone), are

1 not allowed telephone calls except when there is a death in the immediate family, are given food
2 that is already made and always has water in it, are kept in cells 23 hours per day, experience
3 delays in the processing of mail, and are not allowed to take photographs.

## DISCUSSION

A.   Review of First Amended Complaint

A federal court must engage in a preliminary screening of any case in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity. See 28 U.S.C. §1915A(a). The court must identify any cognizable claims, and dismiss any claims which are frivolous, malicious, fail to state a claim upon which relief may be granted, or seek monetary relief from a defendant who is immune from such relief. See 28 U.S.C. §1915A(b)(1),(2).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the violation was committed by a person acting under the color of state law. See West v. Atkins, 487 U.S. 42, 48 (1988).

1.   Discretionary Release From The SHU

Interests that are procedurally protected by the Due Process Clause may arise from two sources--the Due Process Clause itself and laws of the states. See Meachum v. Fano, 427 U.S. 215, 223-27 (1976). In the prison context, these interests are generally ones pertaining to liberty. Changes in conditions so severe as to affect the sentence imposed in an unexpected manner implicate the Due Process Clause itself, whether or not they are authorized by state law. See Sandin v. Conner, 515 U.S. 472, 484 (1995) (citing Vitek v. Jones, 445 U.S. 480, 493 (1980) (transfer to mental hospital), and Washington v. Harper, 494 U.S. 210, 221-22 (1990) (involuntary administration of psychotropic drugs)). Plaintiff's is not a case involving changes so severe as to implicate the Due Process Clause itself.

Deprivations that are less severe or more closely related to the expected terms of

4

confinement may also amount to deprivations of a procedurally protected liberty interest, provided that state statutes or regulations narrowly restrict the power of prison officials to impose the deprivation and that the liberty in question is one of "real substance." See id. at 477-87. A state most commonly restricts the power of prison officials by a two-step process: (1) establishing "substantive predicates" to govern official decisionmaking, i.e., "particularized standards or criteria to guide the [s]tate's decisionmakers," and then (2) requiring, "in explicitly mandatory language," that if the substantive predicates are met, a particular outcome must follow. See Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 461-64 (1989). An interest of "real substance" will generally be limited to freedom from restraint that imposes "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" or "will inevitably affect the duration of [a] sentence," Sandin, 515 U.S. at 484, 487.

There is some uncertainty as to whether Sandin has eliminated the requirement that state law narrowly restrict the power of prison officials to impose the deprivation and instead requires only that there be an interest of real substance to determine that an inmate has a right to due process before being deprived of that interest. In Sandin, the Court criticized earlier decisions that focused on the language of the regulations rather than the nature of the interest because they "encouraged prisoners to comb regulations in search of mandatory language on which to base entitlements to various state-conferred privileges." Sandin, 515 U.S. at 481. The language-based approach in which courts and prisoners searched for negative implication from mandatory language in prisoner regulations had "strayed from the real concerns undergirding the liberty protected by the Due Process Clause." Id. at 483. The Court reiterated that states "may under certain circumstances create liberty interests which are protected by the Due Process Clause. . . . But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force. . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 484. See Jackson v. Carey, 353 F.3d 750, 755 (9th Cir. 2003) ("focus of the liberty interest inquiry is whether the challenged condition imposes an atypical and significant hardship"); Duffy v. Riveland, 98 F.3d 447, 457

5

(9th Cir. 1996) (implying that Sandin reformulated working definition of liberty interest to include only "real substance" prong).

While there may be some uncertainty as to whether the court needs to find mandatory language creating the liberty interest, there is no uncertainty at all that an atypical and significant hardship must exist to find that a liberty interest is protected by the Due Process Clause. Sandin made clear the need for an atypical and significant hardship and the Supreme Court recently reiterated its adherence to Sandin's rule in Wilkinson v. Austin, 545 U.S. 209, 222-24 (2005). Whether the due process analysis after Sandin has two prongs – i.e., (1) an atypical and significant hardship and (2) a state-created interest due to mandatory language – or just one prong, it is beyond dispute that at least the first prong is required.

The liberty interest in not being subjected to the harsh conditions of the Pelican Bay SHU on an indefinite basis is <u>not</u> at issue in this claim, nor is the due process requirement that inmates so confined receive periodic review of their SHU placement.[1]  Rather, the claim pertains to the review of Pina's case for his possible release from the SHU as an inactive gang affiliate.

Pina did not have a protected liberty interest in having prison officials comply with the state regulations regarding inactive gang affiliates, regardless of the existence of the periodic reviews by the ICC. Where, as here, the conditions of confinement did not change at all -- Pina was in the SHU before, during and after defendants' activities -- there was no imposition of a restraint that imposed an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.[2]  His claim fails on the first prong of Sandin because he was

---

[1] Existing case law explains that due process requires some sort of periodic review of the inmate's confinement in the SHU that is more than a meaningless gesture. See Hewitt v. Helms, 459 U.S. 460, 477 n.9 (1983); Toussaint v. McCarthy, 801 F.2d 1080, 1101-02 (9th Cir. 1986). The periodic reviews of SHU placement occur regardless of whether an inmate is under consideration for release as an inactive gang affiliate. The periodic reviews are done by the ICC, rather than the DRB. See 15 Cal. Code Regs. § 3341.5(c)(2)(A). The DRB's activities are not the periodic review required for inmates placed in the SHU indefinitely. To the extent there was a liberty interest in not being kept in the SHU as a prison gang affiliate without procedural protections, Pina was not denied that liberty interest as he did receive the periodic review required under Hewitt and Toussaint.

[2] There also was no inevitable effect on the duration of Pina's confinement because he was in custody on an indeterminate life sentence.

6

not deprived of an interest of real substance.

If the due process analysis has two prongs after <u>Sandin</u>, Pina's claim would fail also on the second prong because he has misread the applicable regulations and ignored their discretionary nature. The regulations permit, but do not require, the review of the active/inactive status of an inmate and permit, but do not require, the release from the SHU of an inmate determined to be an inactive gang member or associate. "As provided at section 3378(e), the Departmental Review Board (DRB) <u>may</u> authorize SHU release for prison gang members or associates categorized as inactive. The term inactive means that the inmate has not been involved in gang activity for a minimum of six (6) years. . . . The DRB <u>is authorized to retain an inactive gang member or associate in a SHU</u> based on the inmate's past or present level of influence in the gang, history of misconduct, history of criminal activity, or other factors indicating that the inmate poses a threat to other inmates or institutional security." 15 Cal. Code Regs. § 3341.5(c)(5) (emphasis added). Section 3378(e), in turn, provides: "An inmate housed in a security housing unit (SHU) as a gang member or associate <u>may</u> be considered for review of inactive status by the Department Review Board when the inmate has not been identified as having been involved in gang activity for a minimum of six (6) years." Section 3341.5 does not establish substantive predicates and does not require in explicitly mandatory language that if certain substantive predicates were met, a particular outcome must follow. <u>See</u> <u>Kentucky Dep't of Corrections v. Thompson</u>, 490 U.S. at 461-64. The regulation's permissive language gave Pina no constitutionally protected right to a review of his file or right to release from the SHU based on his gang inactivity. Section 3341.5(c)(5) allows the retention in the SHU of even an inactive gang member or associate. The regulation is discretionary, not mandatory, and therefore does not create a protected liberty interest and cannot be the basis for a federal due process claim. This means that Pina's claim would fail on the second prong of the due process analysis, if that prong still exists after <u>Sandin</u>.

7

### 2. Opening Of Legal Mail

Prison officials may institute procedures for inspecting "legal mail," e.g., mail sent between attorneys and prisoners, see Wolff v. McDonnell, 418 U.S. 539, 576-77 (1974) (incoming mail from attorneys). However, the opening and inspecting of legal mail outside the presence of the prisoner may have an impermissible "chilling" effect on the constitutional right to petition the government, see O'Keefe v. Van Boening, 82 F.3d 322, 325 (9th Cir. 1996), and should not be read or copied without the prisoner's permission. See Casey v. Lewis, 43 F.3d 1261, 1269 (9th Cir. 1994), rev'd on other grounds, 518 U.S. 343 (1996). Prison officials must establish that legitimate penological interests justify the policy or practice. See O'Keefe, 82 F.3d at 327.

Liberally construed, the first amended complaint states a claim for relief against defendants Parker, Depew and Carrier for interference with Pina's First Amendment rights based on their opening and reading of his legal mail. For the reasons discussed in Section 4, below, the other defendants mentioned in this claim who handled Pina's inmate appeals do not have liability for their handling of his inmate appeals for the already-completed mail confiscation.

### 3. The McCovey Problem

The lengthy section of the first amended complaint concerning the personnel problem for C/O McCovey that only tangentially involves Pina does not state a claim upon which relief may be granted under § 1983. Pina has no standing to complain of violations of the correctional officer's rights. And Pina had no federally protected right of his own in this incident. Pina had no federal due process right to see records that may have mentioned his name, and no federal due process right to have the records corrected if he discovered something false about him in the records. As explained in Section 1, above, there must be (1) an atypical and significant hardship and (2) a state-created interest due to mandatory language for there to be a liberty interest protected by the Due Process Clause. Here, at least the first prong was completely missing, as Pina did not suffer any hardship, let alone an atypical and significant hardship, as a result of any mention about him in any records pertaining to C/O McCovey's personnel problem.

8

### 4. Inmate Appeals

The failure to grant an inmate's appeal in the prison administrative appeal system does not amount to a due process violation. There is no federal constitutional right to a prison administrative appeal or grievance system for California inmates. See Mann v. Adams, 855 F.2d 639, 640 (9th Cir. 1988); Antonelli v. Sheahan, 81 F.3d 1422, 1430 (7th Cir. 1996). The denial of an inmate appeal is not so severe a change in condition as to implicate the Due Process Clause itself and the State of California has not created a protected interest in an administrative appeal system in its prison. California Code of Regulations, title 15 sections 1073 and 3084.1 grant prisoners a purely procedural right: the right to have a prison appeal. The regulations simply require the establishment of a procedural structure for reviewing prisoner complaints and set forth no substantive standards; instead, they provide for flexible appeal time limits, see Cal. Code Regs. tit. 15, § 3084.6, and, at most, that "no reprisal shall be taken against an inmate or parolee for filing an appeal," id. § 3084.1(d). A provision that merely provides procedural requirements, even if mandatory, cannot form the basis of a constitutionally cognizable liberty interest. See Smith v. Noonan, 992 F.2d 987, 989 (9th Cir. 1993); see also Antonelli, 81 F.3d at 1430 (prison grievance procedure is procedural right that does not give rise to protected liberty interest requiring procedural protections of Due Process Clause).

Pina had no federal constitutional right to a properly functioning appeal system. An incorrect decision on an administrative appeal or failure to process the appeal in a particular way therefore did not amount to a violation of his right to due process. The claims concerning the handling of the administrative appeals are dismissed for failure to state a claim upon which relief may be granted. To the extent he suggests that the failure to process an appeal may interfere with a right of access to the courts, no claim upon which relief may be granted is stated because no actual injury has occurred. See Lewis v. Casey, 518 U.S. 343, 350-51 (1996).

### 5. Marking Of Outgoing Mail

Prisoners enjoy a First Amendment right to send and receive mail. Witherow v. Paff, 52 F.3d 264, 265 (9th Cir. 1995) (citing Thornburgh v. Abbott, 490 U.S. 401, 407 (1989)). A

9

prison may adopt regulations or practices which impinge on a prisoner's First Amendment right to send mail if those restrictions further "'an important or substantial governmental interest unrelated to the suppression of expression'" and the limitations on the First Amendment freedoms are no greater than necessary to protect that interest. See Barrett v. Belleque, No. 06-35667, slip op. 13347, 13350 (9th Cir. Sept. 22, 2008) (quoting Procunier v. Martinez, 416 U.S. 396, 413 (1974), overruled on other grounds by Thornburgh v. Abbott, 490 U.S. 401, 413-14 (1989)).

Pina claims that the policy of stamping of outgoing mail to reflect that it came from the SHU violates his First Amendment right to free speech. Liberally construed, the first amended complaint states a claim for relief against defendant Scavetta, the associate warden who authored the policy of which Pina complains.

### 6. SHU Hardships

Pina asserts that the overall conditions of the SHU violate his Eighth Amendment rights. The claim cannot proceed. Pina, as an inmate in the SHU, is a member of plaintiff class in the Madrid v. Gomez class action litigation concerning the SHU conditions. Judge Henderson in that case has ruled that the overall conditions of the SHU do not violate the Eighth Amendment for the non-mentally ill inmates therein. See Madrid v. Gomez, 889 F.Supp. 1146, 1227-30, 1260-65 (N.D. Cal. 1995). Pina may not relitigate the claim individually.

### B. Miscellaneous Motions

Plaintiff filed a second motion for appointment of counsel to represent him in this action. A district court has discretion under 28 U.S.C. § 1915(e)(1) to designate counsel to represent an indigent civil litigant in exceptional circumstances. See Wilborn v. Escalderon, 789 F.2d 1328, 1331 (9th Cir. 1986). This requires evaluation of both the likelihood of success on the merits and the ability of the plaintiff to articulate his claims pro se in light of the complexity of the legal issues involved. See id. Neither of these factor is dispositive and both must be viewed together before deciding on a request for counsel under section 1915(e)(1). The motion is DENIED with

prejudice. Now that the viable claims have been identified, it is clear that they do not present legally complex issues. It also appears that the likelihood of success on the claims is low: although interference with mail claims can be pled with relative ease, it is highly unlikely that the prison officials will be unable to show the necessary penological interests to withstand both challenges, even for the outgoing mail where the standard is higher.

Plaintiff filed a request for production of documents. The request will be dismissed as improperly filed. Discovery requests and responses are not to be filed with the court in general. Discovery requests and responses should be exchanged between the parties without court oversight unless and until a problem arises which the parties are unable to resolve among themselves.

**CONCLUSION**

For the foregoing reasons,

1. The first amended complaint states a claim for relief under 42 U.S.C. § 1983 against defendants Parker, Depew and Carrier for a First Amendment violation based on opening Pina's legal mail and against defendant Scavetta for a First Amendment violation based on her authorizing the policy of stamping outgoing mail to indicate its origin. All other defendants and claims are dismissed.

2. The clerk shall issue a summons and the United States Marshal shall serve, without prepayment of fees, the summons, a copy of the first amended complaint and a copy of all the documents in the case file upon four defendants, all of whom allegedly work at Pelican Bay State Prison: (1) correctional officer I. Parker, (2) mail room supervisor P. Carrier, (3) mail room supervisor D. Depew, and (4) associate warden Cynthia Scavetta.

3. In order to expedite the resolution of this case, the following briefing schedule for dispositive motions is set:

   a. No later than **December 19, 2008**, defendants must file and serve a motion for summary judgment or other dispositive motion. If defendants are of the opinion that this case cannot be resolved by summary judgment, they must so inform the court prior to the date the

motion is due.

      b.    Plaintiff's opposition to the summary judgment or other dispositive motion must be filed with the court and served upon defendants no later than **January 30, 2009**. Plaintiff must bear in mind the following notice and warning regarding summary judgment as he prepares his opposition to any summary judgment motion:

> The defendants may make a motion for summary judgment by which they seek to have your case dismissed. A motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure will, if granted, end your case. [¶] Rule 56 tells you what you must do in order to oppose a motion for summary judgment. Generally, summary judgment must be granted when there is no genuine issue of material fact -- that is, if there is no real dispute about any fact that would affect the result of your case, the party who asked for summary judgment is entitled to judgment as a matter of law, which will end your case. When a party you are suing makes a motion for summary judgment that is properly supported by declarations (or other sworn testimony), you cannot simply rely on what your complaint says. Instead, you must set out specific facts in declarations, depositions, answers to interrogatories, or authenticated documents, as provided in Rule 56(e), that contradict the facts shown in the defendants' declarations and documents and show that there is a genuine issue of material fact for trial. If you do not submit your own evidence in opposition, summary judgment, if appropriate, may be entered against you. If summary judgment is granted, your case will be dismissed and there will be no trial. (See Rand v. Rowland, 154 F.3d 952, 962-63 (9th Cir. 1998).

      c.    If defendants wish to file a reply brief, the reply brief must be filed and served no later than **February 20, 2009**.

4.    All communications by plaintiff with the court must be served on a defendant's counsel by mailing a true copy of the document to defendant's counsel. The court may disregard any document which a party files but fails to send a copy of to his opponent. Until a defendant's counsel has been designated, plaintiff may mail a true copy of the document directly to defendant, but once a defendant is represented by counsel, all documents must be mailed to counsel rather than directly to that defendant.

5.    Discovery may be taken in accordance with the Federal Rules of Civil Procedure. No further court order under Federal Rule of Civil Procedure 30(a)(2) or Local Rule 16 is required before the parties may conduct discovery.

6.    Plaintiff is responsible for prosecuting this case. Plaintiff must promptly keep the court informed of any change of address and must comply with the court's orders in a timely

fashion. Failure to do so may result in the dismissal of this action for failure to prosecute pursuant to Federal Rule of Civil Procedure 41(b). Plaintiff must file a notice of change of address in every pending case every time he is moved to a new facility.

7. Plaintiff is cautioned that he must include the case name and case number for this case on any document he submits to this court for consideration in this case.

8. Plaintiff's motion for appointment of counsel is DENIED. (Docket # 16.)

9. Plaintiff's request for production of documents is DISMISSED as improperly filed. (Docket # 17.)

IT IS SO ORDERED.

Dated: October 28, 2008

_____
SUSAN ILLSTON
United States District Judge